[L.A. No. 29757. In Bank. Oct. 29, 1970.]

THEODORE E. PLACE, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD,
INTERIOR CONSTRUCTION SYSTEMS et al., Respondents.

COUNSEL

Sheldon Pinchuk and Robert D. Wilner for Petitioner.

Rupert A. Pedrin, Nathan Mudge, Sheldon M. Ziff, Lionel K. Hvolboll, Mansell & Giddens and John L. Maier for Respondents.

OPINION

TOBRINER, J.—Petitioner Theodore Place seeks review of a decision after reconsideration of the Workmen's Compensation Appeals Board denying him an award for permanent disability. Place sustained an injury to his back in a fall that occurred in the course of his employment as a truck driver on June 26, 1967; the sole issue turns on whether substantial evidence supports the board's finding that he suffered no permanent injury from this trauma. The board's adverse determination emanates from a single medical report, to the exclusion of other medical reports. We conclude that the one medical report is speculative and conjectural; consequently that board's decision cannot stand.

1. *Petitioner's medical history*

Prior to the injury of June 26, 1967, petitioner had suffered some difficulty with his back in 1963. In November of that year he experienced pain in his back and legs, plus numbness in his legs, and entered the Veteran's Administration Hospital in Los Angeles for treatment. A myelogram revealed disc degeneration between the 8th and 9th thoracic vertebrae; a laminectomy was performed. Some 18 months after the operation, petitioner no longer experiencing pain, resumed work. In June of 1967 he was employed as a truck driver with respondent Interior Construction Systems, performing the duties of his employment without physical difficulty or need for medical attention.

While in the course of his employment, on June 26, 1967, petitioner slipped and fell, landing on his back and head. Within three or four days he began to experience pain in his back, and pain and numbness in his

legs. His condition became worse, and on August 18 he ceased work. On August 21 he first sought medical assistance and was referred to Dr. Wolf, an orthopedic surgeon.

Dr. Wolf treated petitioner with physical therapy, which produced temporary relief of pain. Nevertheless petitioner's condition continued to deteriorate; he developed a peculiar gait and difficulties with his bladder and bowels. X-rays and myelograms taken in the autumn of 1967 did not reveal the cause of petitioner's difficulties. By June of 1968, when petitioner entered the Veteran's Administration Hospital in Grand Junction, Colorado, he suffered considerable pain and could not walk without assistance. Tests revealed calcification between the 8th and 9th thoracic vertebrae, with calcifications protruding into the spinal canal. An operation removed a bony bridge and calcified disc material.

After the operation petitioner suffered no pain, but experienced difficulty in moving his legs. As of January 20, 1969, the most recent medical examination in the record, he could walk with crutches, but remained totally disabled for employment.

## 2. *Summary of medical reports*

The parties filed the reports of four physicians with the board.[1] These reports stated that petitioner incurred an injury to his back on June 26, 1967, but disagreed as to whether he injured the lumbar (lower) back or reinjured the thoracic (upper) spine.[2] Only two reports indicated that

---

[1]Dr. Wolf, who treated petitioner with physical therapy during August and September of 1967, reported that "Mr. Place incurred in the accident of June 26, 1967, a considerable contusion of the lower back. At this time, there is no evidence of any lumbar intervertebral disc involvement."

Dr. Coulter examined petitioner on January 19, 1968. He concluded that petitioner "has sustained a sprain of the lumbar spine, superimposed upon an old injury to his thoracic spinal cord. There is no definite evidence that the previous back injury has been aggravated other than the history of bladder and bowel difficulties recently. . . . His present condition of mild lumbar spine sprain should become permanent and stationary with treatment by February 1, 1968."

Dr. Lattin examined petitioner in November of 1967 and again in May 1968. He concluded that "his diagnosis with regard to his June 1967 injury remains that of lumbosacral sprain residua. . . . I would . . . apportion his problem as being at least 75 per cent due to the pre-existing thoracic disc disease."

Dr. Bolles prepared a report following the operation in June of 1968. He concluded that "this man's problems do relate to his previous thoracic disc surgery, however . . . he reinjured this area with his fall in June of 1967 and created an acute exacerbation of his condition which, over the past several months, has been progressively getting worse."

[2]If petitioner's injury of June 26, 1967, aggravated a previously nondisabling condition, he is entitled to recover for the entire resulting disability. "It is well settled that the acceleration, aggravation or 'lighting up' of a preexisting nondisabling condition is an injury in the employment causing it and 'If the resultant disability is entirely

petitioner's condition was sufficiently stable to be ratable. Dr. Lattin apportioned petitioner's disability "at least 75 per cent due to the preexisting thoracic disc disease"; but Dr. Bolles, the neurosurgeon who performed the operation in June 1968, implied that the aggravation caused by petitioner's fall was primarily responsible for his disability.

The referee then wrote the parties, stating that in view of the conflicting medical reports he would normally appoint an independent medical examiner, but was unable to do so because petitioner was living in Colorado. The parties then arranged for Dr. Freed of Denver to serve as an independent medical examiner.

Although all of the previous medical reports agreed that petitioner's fall of June 26, 1967, had in part caused the injury to his back, and although the only pending question had been one of apportionment between that injury and the earlier difficulties of 1963, Dr. Freed stated that petitioner's fall worked no injury to the back whatsoever. His report, dated January 20, 1969, concludes that "It would seem to me that, if the ruptured thoracic disc for which the patient underwent surgery was caused or aggravated by the injury of June 26, 1967, the patient would have sought medical attention before August 18, 1967. In other words, I would think that he should have had some symptoms immediately at the onset which would have led him to seek medical attention. Ruptured thoracic discs are a very rare entity, and here is a man who had apparently had two operations for ruptured thoracic disc. I believe the possibility of some other neurological disease must be seriously entertained; in view of this man's history, I think multiple sclerosis or some demyelinizing disease of the nervous system has to be considered. The block apparently apparent in his myelography at the V.A. Hospital in Denver could, of course, be secondary to adhesions from his first operation."

After receiving Dr. Freed's report, the referee found that petitioner's injury resulted in no ratable permanent disability. Petitioner petitioned for reconsideration, submitting a report of Dr. Black, chief surgeon at the Grand Junction Veteran's Administration Hospital.

Dr. Black's report asserted that the diagnosis that petitioner's problems stemmed from thoracic disc injury "had been substantiated beyond reasonable doubt," that after three years of employment applicant fell and injured his back and thereafter sustained progressive symptoms, and

---

due to the industrial injury lighting up the previous dormant condition, then the employer is liable for the disability and there can be no apportionment.' " (*Fred Gledhill Chevrolet* v. *Industrial Acc. Com.* (1964) 62 Cal.2d 59, 61 [41 Cal.Rptr. 170, 396 P.2d 586]; see *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 796 [69 Cal.Rptr. 88, 441 P.2d 928].)

concludes that "it would seem reasonable to assume a sequential relationship of the symptoms to the injury." Noting Dr. Freed's argument that petitioner should have sought medical treatment earlier, Dr. Black asserted, erroneously, that petitioner had received physical therapy during the period June-August 1967. Turning to Dr. Freed's suggestion that petitioner suffered from a coincidental disease of the nervous system, Dr. Black noted that neither he nor any of the other physicians who examined petitioner could establish such a diagnosis. Dr. Black concluded that, following the operation, petitioner's "original condition had attained a static status which in my opinion was altered as a consequence of the fall to such a point that further surgery was required, and there is a resulting permanent partial disability which approaches total disability."

### 3. The decision of the Workmen's Compensation Appeals Board

Although the board granted reconsideration to review Dr. Black's report, it nevertheless did not accept the doctor's conclusions, and on January 13, 1970, issued its opinion affirming the findings of the referee. In its opinion the board noted that Dr. Black had incorrectly assumed that petitioner had sought medical care shortly after his fall and had received physical therapy during the period before petitioner left his employment on August 18, 1967; in fact, petitioner first saw a physician on August 21 of that year. The board thereupon rejected Dr. Black's opinion as based on an incorrect medical history.

The board stated that "we accept the hypothesis of the agreed medical examiner, Dr. Charles G. Freed, that 'if the ruptured thoracic disc for which the patient underwent surgery was caused or aggravated by the injury of June 26, 1967, the patient would have sought medical attention before August 18, 1967.' From this evidence and all the evidence of record, we are persuaded that Applicant's condition and need for medical treatment relates to his underlying disease and was neither caused nor aggravated by his injury of June 26, 1967."[3]

### 4. The lack of support of substantial evidence for the board's determination

Although, as the board points out, we must sustain its conclusions if they are supported by substantial evidence, we shall explain that

---

[3]Petitioner received temporary disability payments from August 18, 1967 to November 11, 1968. The board refused a request by respondent Interior Construction Systems that it order refund of that amount, and Interior Construction Systems did not seek a writ of review.

they cannnot stand if they rest upon no more than a doctor's surmise. The board initially calls our attention to two principles of appellate review, neither of which we question: (1) that "[i]n reviewing the evidence our legislative mandate and sole obligation is to review the entire record to determine whether the board's conclusion was supported by substantial evidence" (*LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432]); (2) that "factual determinations of the board must be upheld if there is substantial evidence in their support and the relevant and considered opinion of one physician, though inconsistent with other medical opinions, may constitute substantial evidence" (*Smith* v. *Workmen's Comp. App. Bd.* (1969) 71 Cal.2d 588, 592 [78 Cal.Rptr. 718, 455 P.2d 822]).

Expert medical opinion, however, does not always constitute substantial evidence on which the board may rest its decision. Courts have held that the board may not rely on medical reports which it knows to be erroneous (*McCoy* v. *Industrial Acc. Com.* (1966) 64 Cal.2d 82, 92 [48 Cal.Rptr. 858, 410 P.2d 362]), upon reports which are no longer germane. (*Jones* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 476, 480 [67 Cal.Rptr. 544, 439 P.2d 648]), or upon reports based upon inadequate medical history or examinations (*West* v. *Industrial Acc. Com.* (1947) 79 Cal.App.2d 711, 716 [180 P.2d 972]; *Blankenfeld* v. *Industrial Acc. Com.* (1940) 36 Cal.App.2d 690, 698 [98 P.2d 584]). In *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928], we held that "an expert's opinion which does not rest upon relevant facts or which assumes an incorrect legal theory cannot constitute substantial evidence. . . ."

An expert opinion is also insufficient to support a board determination when that opinion is based on surmise, speculation, conjecture, or guess. (*Owings* v. *Industrial Acc. Com.* (1948) 31 Cal.2d 689, 692 [192 P.2d 1]; *Spillane* v. *Workmen's Comp. App. Bd.* (1969) 269 Cal.App.2d 346, 351 [74 Cal.Rptr. 671]; *Industrial Indem. Co.* v. *Industrial Acc. Com.* (1949) 90 Cal.App.2d 262, 265-266 [202 P.2d 585]; *Brown* v. *Industrial Acc. Com.* (1941) 44 Cal.App.2d 6, 12 [111 P.2d 931]; *Hendricks* v. *Industrial Acc. Com.* (1938) 25 Cal.App.2d 534, 537 [78 P.2d 189]; see *Garza* v. *Workmen's Comp. App. Bd.* (1970) *ante,* pp. 312, 318, fn. 3 [90 Cal.Rptr. 355, 475 P.2d 451].) Thus in *Hendricks* the board relied on a medical report which attributed the petitioner's fracture not to his fall but to an uncertain and unexplained "pathological condition"; the Court of Appeal reversed. In *Brown* the board granted a petition to terminate liability based upon medical reports which stated that the petitioner still suffered pain but that the doctors could not determine the cause of the pain, and they therefore suspected him of ma-

lingering; the court reversed the board's decision, stating that "where the finding purporting to support an award is necessarily based on mere surmise, speculation, conjecture or guess, the award will be annulled." (44 Cal.App.2d 6, 12.) In *Owings* a doctor "guessed" that the blow to petitioner's head might have caused his diabetes; we reversed the award, observing that "[a]n opinion which is based on guess, surmise or conjecture has little, if any, evidentiary value." (31 Cal.2d 689, 692.)

We now apply these principles to Dr. Freed's medical report. At the threshold we note the uncontradicted and unimpeached testimony of petitioner (see *Garza* v. *Workmen's Comp. App. Bd.* (1970) *supra, ante,* pp. 312, 317; *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 639 [83 Cal.Rptr. 208, 463 P.2d 432]; *McAllister* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408, 413 [71 Cal.Rptr. 697, 445 P.2d 313]) that as of June 1967, his condition was largely dormant and asymptomatic, that he suffered a severe fall on June 26, 1967, and that symptoms of pain and numbness first appeared about four days later. All of the medical reports, including that of Dr. Freed, assume the truth of this testimony. All the examining doctors observed that petitioner's symptoms became progressively more disabling from June of 1967 until his operation a year later; yet no physician suggested that such progression was inconsistent with the hypothesis that the fall in June aggravated a previously dormant condition.

Given the truth of this testimony, the fact that petitioner delayed seeking medical attention until his symptoms disabled him from employment attains little probative value. Yet Dr. Freed rested his diagnosis almost exclusively upon the fact that petitioner did not sooner seek medical assistance; that if the disc injury was caused or aggravated by the June 26th fall, "he should have had some symptoms immediately at the onset which would have led him to seek medical attention." The conceivable reasons for petitioner's delay in soliciting medical aid fall within the realm of the speculative. (See *Garza* v. *Workmen's Comp. App. Bd.* (1970) *supra, ante,* pp. 312, 319.) His delay may have resulted from his fortitude and determination to overcome the pain and not permit it to interfere with a normal life; it may have symbolized an optimism that in the immediate future the pain would disappear; it may have shown a disenchantment with the medical profession; it may have simply demonstrated that petitioner had an above-average capacity to endure pain; it may have indicated, too, that he feared that further medical treatment would impede his ability to work and support his family.

We can conjure a myriad of possible reasons for the delay; Dr. Freed,

however, does not favor us with one word in his report as to any interrogation or analysis of the patient in support of the doctor's surmise as to why petitioner did not sooner seek medical help. If we were to accept the doctor's hypothesis, we might well subject the petitioner to a penalty for his very forbearance and fortitude. Dr. Freed did not, so far as his report shows, inquire into petitioner's reasons for his delay; Dr. Freed does not explain why this delay shows that the fall did not precipitate petitioner's symptoms; the doctor offers no other explanation of why petitioner's condition began to deteriorate after June of 1967.

Dr. Freed's suggestion that petitioner may suffer from multiple sclerosis or some other neurological disease is a further patent speculation. Dr. Freed did not determine that petitioner was, or was probably, suffering from some neurological disease; he merely suggests that whatever physician is treating petitioner ought to consider that possibility. As Dr. Black's report pointed out, no physician who has examined or treated petitioner has been able to establish a diagnosis of any neurological disease.

The reports of Doctors Wolf, Lattin, Bolles, and Black all agree that petitioner's present permanent disability is due in part to injury sustained in his fall of June 26, 1967. The contrary opinion of Dr. Freed cannot serve to support the board's determination. Upon reviewing the entire record in this case we hold that the board lacked substantial evidence to support its finding that petitioner sustained no permanent disability arising from an industrial injury.

The decision of the Workmen's Compensation Appeals Board is annulled and the cause remanded to the board for proceedings consistent with the views expressed herein.

Wright, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the decision of the Workmen's Compensation Appeals Board.