[Civ. No. 13483. Fourth Dist., Div. Two. Nov. 8, 1974.]

MARJORIE J. TURNER et al., Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD and
SOUTHERN CALIFORNIA EDISON COMPANY, Respondents.

**COUNSEL**

Beloud, Althouse & Vickers, Robert G. Beloud and Jay G. Vickers for Petitioners.

Rollin E. Woodbury, Robert J. Cahall, F. Leonard Sisk, James A. Trecartin, Harry W. Young and Norman E. Carroll for Respondents.

Warren L. Hanna as Amicus Curiae on behalf of Respondents.

## OPINION

**KERRIGAN, Acting P. J.**—Elie Turner, while employed as a district superintendent for Southern California Edison Company,[1] experienced partial paralysis of the legs when working late one night. He managed to drive home, was hospitalized and died nine (9) days later. Death resulted from the rupture of an aneurysm of the anterior cerebral artery at the base of the brain (brain hemorrhage).

His widow filed an application for death benefits on behalf of herself and the dependent minor child of the parties. At the time of the hearing before the trial referee, the crucial issue was whether the death occurred as a result of an injury arising out of the employment. Two medical doctors filed written reports on the causation issue: one upon behalf of the widow; and the other on Edison's behalf. Both were cross-examined thereon. The referee found that death resulted from the employment and awarded the widow and minor maximum benefits. The board granted Edison's petition for reconsideration. It noted that there was a conflict in the medical opinions and appointed an independent medical examiner (IME). The IME filed his report and was cross-examined thereon before another referee. On the basis of the IME's report, the board entered an opinion and decision after reconsideration denying the widow and the minor child any benefits.

This court summarily denied a petition for review. The Supreme Court granted the widow's petition and retransferred the case to this court with directions to issue a writ of review, citing its decision in *Lamb* v. *Workmen's Comp. Appeals Bd.,* 11 Cal.3d 274 [113 Cal.Rptr. 162, 520 P.2d 978], and this court's opinion in *Greenberg* v. *Workmen's Comp. Appeals Bd.,* 37 Cal.App.3d 792 [112 Cal.Rptr. 626].

We hold that the widow and the minor are entitled to recover.

### FACTS

Turner (Employee) was 55 years old at the time of his death. With the exception of three years military service in World War II, he had been continuously employed by the Edison Company (Employer) from September 1941 until his death in May 1971. Over the years, he worked his way up from car washer to groundman to crew assistant to clerk to senior clerk to assistant superintendent. In 1965, he was made district superin-

---

[1]Edison is a permissibly self-insured employer.

tendent. As reflected by his record of promotions, he was a fine employee with a splendid work and attendance record.

In his capacity as superintendent, he had the responsibility of the line crews, line construction and all administrative work involved in managing the district. His normal working hours were from 8 a.m.-5 p.m. However, he was on-call 24 hours a day and frequently worked overtime. During emergencies, he worked extraordinarily long hours. For example, in January 1970, in an effort to provide service following the havoc created by a storm, he spent 140 hours on the job from Sunday to Sunday.

For several years prior to his death, he suffered from severe headaches. In 1967-1968, he experienced systolic hypertension. While his blood pressure readings for 1969-1970 indicated some lessening of the pressure, they remained in the high-normal range.

On May 11, 1971 (Tuesday) he went to work at 7:15 a.m. Inasmuch as he was to start his vacation within a few days, he worked late for the purpose of clearing up a mass of unfinished paper work. Being a conscientious person, he took his administrative problems seriously. In addiion, he was "bugged" by pressure from his superiors. The volume of paper work and the constant changes in the "system" bothered him considerably.

About 7 p.m., his wife visited the office and brought him a sandwich and some coffee. He told her he had to complete the paper work in the hope of finishing it up all by Friday so they could start their vacation as planned. His wife remained about 30 minutes. He did not appear to be in any distress although he occasionally pressed the back of his head (this was symptomatic of a headache). About an hour after his wife left, he experienced partial paralysis in his legs. He got in his car, drove home, arrived around 9:30 p.m. and told his son what had happened. Initially, he refused to go to the hospital. His wife arrived home about 11 p.m. and the youngster told her what had happened. By that time, Turner was in obvious distress and his wife persuaded him to go to the hospital. He died nine days later.

The three physicians who rendered opinions herein agreed that Turner died of a rupture of a *congenital aneurysm* of the anterior cerebral artery.[2] All agreed that he had suffered from headaches and hypertension. But

---

[2]Aneurysms are dilations of an artery wall which may pouch out from the artery like a thin-walled balloon or like a "bubble" on the outside of a tire; this weakened, dilated area of a cerebral artery is filled with blood; if it bursts, blood seeps out, accumulates, and presses upon delicate brain tissue and produces a stroke or stroke-like symptoms.

they disagreed on the critical question of whether the elevations of Turner's blood pressure resulted from stress and strain experienced in his employment.

Applicant's doctor was of the opinion that the tension experienced during the four-five years preceding the hemorrhage, when coupled with the tension experienced in working long hours on the date of the hemorrhage, resulted in the raising of Turner's blood pressure sufficiently to cause stress in the area of the aneurysm and was therefore instrumental in causing dilation of the aneurysm and thinning of its wall and the subsequent rupture of the aneurysm, resulting in the hemorrhage and death.

The employer's expert opined that the aneurysm located in the small artery at the base of Turner's brain was due solely to a congenital defect which resulted in malformation in one of the arteries and that the rupture of the congenital aneurysm was not precipitated or caused by Turner's employment.

The IME's report (which he confirmed in his oral testimony) reads as follows: "From this case it can be readily seen that the patient had hypertension for quite some time and symptoms as far as headaches are concerned in the past. This may or may not be associated with congenital cerebral aneurysms. The nature of the aneurysm is not that definitely identified in his studies and may also be on an arteriosclerotic basis, for if it was congenitally present, may have been involved by the arteriosclerotic process which has been found in other places in this patient's autopsy examination, such as the aorta and coronary arteries, as again evidenced by the autopsy report. It is well-known that changes in interluminal pressure can cause rupture of these markedly diseased vessels, but usually only after disease of the vessel has taken place and weakness of the wall has occurred. This, again, is a long-standing process and rupture of this would have occurred whether this patient was at home doing some work, at rest, or even while sleeping. There is no way that tension could have increased the blood pressure sufficiently to cause actual rupture without predisposing causes. The only way that rupture without predisposing causes could occur is of a sudden nature by external severe pressure changes and decompression which did not take place in this individual's case. [¶] I feel, therefore, from the vascular standpoint that it is impossible to associate this patient's ruptured cerebral aneurysm with any form of his employment and that the occurrence of this rupture was merely an incidental finding."

### ISSUE

The sole issue on review is whether the injury resulting in death arose out of the employment. Resolution of the issue depends on whether

there is substantial evidence to support the board's finding in which it relied primarily on the opinion of the IME.

LAW

Under section 5952 of the Labor Code, the function of an appellate court is to review the entire record to determine whether the board's conclusion is supported by substantial evidence. (*LeVesque* v. *Workmen's Comp. App. Bd.*, 1 Cal.3d 627, 635 [83 Cal.Rptr. 208, 463 P.2d 432].) When (as here) a referee's finding of compensable injury is supported by sound, solid, credible evidence, it is to be accorded great weight by the board and should be rejected only on the basis of contrary evidence of considerable substantiality. (*Lamb* v. *Workmen's Comp. Appeals Bd.*, *supra*, 11 Cal.3d 274, 281; *Greenberg* v. *Workmen's Comp. Appeals Bd.*, *supra*, 37 Cal.App.3d 792, 798-799.)

 The applicant need only show the reasonable probability of industrial causation. (*McAllister* v. *Workmen's Comp. App. Bd.*, 69 Cal.2d 408, 413 [71 Cal.Rptr. 697, 445 P.2d 313].) Although the employee bears the burden of proving that the injury was sustained in the course of his employment, the established legislative policy is that the Workmen's Compensation Act must be liberally construed in the employee's favor and all reasonable doubts as to whether an injury arose out of employment are to be resolved in favor of the employee. (*Lamb* v. *Workmen's Comp. Appeals Bd.*, *supra*, 11 Cal.3d 274, 280; *Lundberg* v. *Workmen's Comp. App. Bd.*, 69 Cal.2d 436, 439 [71 Cal.Rptr. 684, 445 P.2d 300].) This rule is binding upon the board and reviewing courts. (*Garza* v. *Workmen's Comp. App. Bd.*, 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451].)[3]

 Where an employee suffers a stroke brought on by strain or overexertion due to employment, the injury or death is compensable even though the idiopathic condition previously existed. Aggravation of an existing infirmity is compensable, as is an injury which is the result of cumulative work effects. (*Lumberman's Mut. Cas. Co.* v. *Ind. Acc. Com.*, 29 Cal.2d 492, 496-498 [175 P.2d 823].)

---

[3]In a scholarly brief originally filed in the Supreme Court (prior to the transfer of this case to this court), amicus curiae suggests that the *Garza-Lamb* guidelines governing the scope of judicial review of board decisions be re-evaluated. Amicus curiae maintains, in effect, that reviewing courts are reweighing the evidence in workmen's compensation cases and that the *Garza-Lamb* formulas should be re-examined. This court declines the invitation to re-examine the tests for two reasons: (1) we are bound by Supreme Court decisions; and (2) we are in full accord with the rules enunciated in those cases.

While years ago there may have been some doubt as to whether the pressures, stresses and strains generated by employment were predisposing factors in stroke cases, that doubt should have been laid to rest long ago. For a period in excess of 20 years the law has been clear that job-induced stresses and strains which result in a stroke are compensable. An employee subjected to strain in his employment over an extended period of time who suffers a cerebral vascular accident is entitled to compensation for any disability resulting therefrom. (*Fireman's Fund Indem. Co. v. Ind. Acc. Com.,* 39 Cal.2d 831, 834 [250 P.2d 148].)

Similarly, when arteriosclerosis results from job stress and is followed by a heart attack, the injury or death is compensable. (See *Greenberg* v. *Workmen's Comp. Appeals Bd., supra,* 37 Cal.App.3d 792.)

Inasmuch as the board relied mainly upon the report of the independent medical examiner, the question arises whether the IME's opinion was supported by good valid reasons.[4] He conceded that the employee had hypertension. He also conceded that blood pressure had some association with the congenital cerebral aneurysm. He also conceded that high blood pressure could cause rupture of arteriosclerotic blood vessels. He therefore concluded that the rupture could have occurred either at home, at rest, or at work and indicated that tension would not increase the blood pressure without predisposing causes (e.g., arteriosclerosis) and that there was nothing that occurred in the employment that caused a severe change in blood pressure and, therefore, the rupture did not result from the employment.

While the opinion of a single physician can constitute substantial evidence upon which the board may base a decision (*LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 639; *Smith* v. *Workmen's Comp. App. Bd.,* 71 Cal.2d 588, 592 [78 Cal.Rptr. 718, 455 P.2d 822]), the opinion of a doctor based on mere surmise does not constitute sub-

---

[4]Though the board relied primarily upon the IME's opinion, there is present in the record a second medical opinion upon which the board may have (inferentially) relied. Before the trial referee, Edison's doctor concluded that Turner's injury was not industrially caused. The doctor testified that the employee's hypertension was not sufficient in itself to cause the rupture, and presented a study which showed that two-thirds of those afflicted with congenital cerebral aneurysms died before the age of 50. (Turner was 55.) Based upon these facts, Edison's doctor concluded that Turner died of a "natural rupture" of his aneurysm.

But the statistical evidence presented by this physician says nothing about the *cause in fact* of Turner's injury. The question that the expert should have addressed was why, on this particular day, the employee's aneurysm ruptured. Instead, he offered statistics tending to show that Turner's death was not unusual. This opinion does not constitute substantial evidence.

stantial evidence. (*Place* v. *Workmen's Comp. App. Bd.,* 3 Cal.3d 372, 377-378 [90 Cal.Rptr. 424, 475 P.2d 656].) And a medical report devoid of a relevant factual basis "cannot rise to a higher level than its own inadequate premises. Such reports do not constitute [sufficient] evidence to support a denial" of benefits. (*Zemke* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 794, 801 [69 Cal.Rptr. 88, 441 P.2d 928].) Hence, an appellate court must look to the underlying facts of a medical opinion to determine whether or not that opinion constitutes substantial evidence (*Redner* v. *Workmen's Comp. Appeals Bd.,* 5 Cal.3d 83, 96-97 [95 Cal.Rptr. 447, 485 P.2d 799]; *Hegglin* v. *Workmen's Comp. App. Bd.,* 4 Cal.3d 162, 170 [93 Cal.Rptr. 15, 480 P.2d 967]), bearing in mind that the board is not at liberty to completely ignore those parts of a doctor's report and testimony which do not support its conclusion. (*Greenberg* v. *Workmen's Comp. Appeals Bd., supra,* 37 Cal.App.3d 792, 799.) In other words, an expert's opinion is no better than the facts upon which it is based.

▮ The IME ignored the stresses and strains to which Turner had been subjected for several years prior to his death, as well as the pressure experienced from working overtime on the date he had the attack. Neither the doctor nor the board were at liberty to disregard these significant predisposing causes.

In the first place, the IME theorized that the rupture could have occurred anywhere—at home, at work or on the street. The fact is that it occurred on the job. Thus, the IME was hypothesizing when he should have been dealing with realities. Secondly, the IME premised his opinion on the medical fact that the aneurysm was congenital in origin. No claim is made that the congenital defect was in any way disabling during his 25 years of employment with Edison; to the contrary, he worked long hours under pressure, particularly during the six-seven years prior to his demise. ▮ Industry takes the employee as it finds him; a person suffering from a pre-existing disease who is disabled by an injury arising out of the employment is entitled to compensation even though a normal man would not have been adversely affected. (*Liberty Mut. Ins. Co.* v. *Ind. Acc. Com.,* 73 Cal.App.2d 555, 558-559 [166 P.2d 908].) Finally, the IME admitted that there is a direct relationship between tension, high blood pressure and the bursting of an aneurysm. That combination of factors or symptoms is sufficient to establish causation.

▮ Simply stated, Turner was a casualty of industry. He devoted his entire adult life to Edison's service. The long hours, the exasperations and frustrations, the pressures, strains and stresses experienced over the years

resulted in hypertension which, in turn, caused the rupture of the aneurysm and his death.

The board's order is annulled and the case is remanded for further proceedings consistent with the views expressed herein.

Tamura, J., and Kaufman, J., concurred.

The petition of respondent Southern California Edison Company for a hearing by the Supreme Court was denied January 8, 1975.